UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO: ________

CHRISTOPHER D. JEFFERSON,

Plaintiff,

v.

TRINITY DEVELOPMENT INITIATIVE, INC., GENERATIONS CHRISTIAN CHURCH AT TRINITY, INC., JOHNNY SCOTT, individually, TOM KEHOE, individually, DAVID KINCAID, individually, and DANIEL CHEN-FUNG, individually,

Defendants.
_________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, CHRISTOPHER D. JEFFERSON, by and through his undersigned counsel, and hereby sues the Defendants, TRINITY DEVELOPMENT INITIATIVE, INC., GENERATIONS CHRISTIAN CHURCH AT TRINITY, INC., JOHNNY SCOTT, individually, TOM KEHOE, individually, DAVID KINCAID, individually, and DANIEL CHEN-FUNG, individually, and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 et seq. ("FLSA").

2. This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from a common nucleus of operative facts concerning Plaintiff's longstanding business relationship with Defendants, his subsequent employment, and Defendants' failure to pay for the services performed.

3. Venue is proper in the Middle District of Florida, Tampa Division, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Pasco County, Florida.

4. Defendants are engaged in interstate commerce as defined in §§ 3(r) and 3(s) of the Act, 29 U.S.C. §§ 203(r)(1), (2)(A), and 203(s)(1).

5. At all material times, Defendants TDI and GCC operated in or affected interstate commerce, including through commercial development activities and dealings with out-of-state vendors, financial institutions, and prospective investors.

6. During the relevant period, Plaintiff regularly engaged in interstate communications and business activities as part of his employment, including

communications with investors, financing partners, vendors, and other business entities located outside Florida.

## PARTIES

7. Plaintiff, CHRISTOPHER D. JEFFERSON ("Plaintiff" or "Mr. Jefferson"), is an individual who provided marketing and consulting services to GCC and its affiliated entities and was subsequently employed by TDI from approximately September 1, 2024, through March 3, 2025. Plaintiff currently resides in Tennessee.

8. Defendant TRINITY DEVELOPMENT INITIATIVE, INC. ("TDI") is an active Florida for-profit corporation with its principal address at 3030 North Rocky Point Drive, Suite 650, Tampa, Florida 33607.

9. Defendant GENERATIONS CHRISTIAN CHURCH AT TRINITY, INC. ("GCC") is a Florida nonprofit corporation operating at 1540 Little Road, Trinity, Florida 34655.

10. At all times material, GCC owned and controlled TDI, and individuals serving as GCC's governing elders exercised authority over TDI's operations and development activities.

11. Defendant JOHNNY SCOTT ("Mr. Scott") is an individual who, at all times material, served as the lead pastor of GCC and President and Director of TDI, exercising operational authority over TDI and Plaintiff's employment.

12. Mr. Scott personally recruited Plaintiff, negotiated the terms of his employment, directed and supervised his work, communicated with him regarding unpaid compensation, and ultimately terminated his employment.

13. At all times material, Mr. Scott exercised operational control over Plaintiff's employment sufficient to constitute an "employer" within the meaning of 29 U.S.C. § 203(d).

14. TOM KEHOE ("Mr. Kehoe") is an individual who, at all times material, served as Chairman of the governing elders of GCC and provided oversight and leadership for both GCC and TDI.

15. Defendant DAVID KINCAID ("Mr. Kincaid") is an individual who, at all times material, served as Secretary of the governing elders of GCC and provided oversight and leadership for both GCC and TDI.

16. Defendant DANIEL CHEN-FUNG ("Mr. Chen-Fung") is an individual who served as a former Chairman of the governing elders of GCC and provided oversight and leadership for both GCC and TDI during the relevant period.

17. At all times material, the individual elder Defendants exercised authority over the operations and management of GCC and TDI, including participation in decisions concerning Plaintiff's employment and compensation, and exercised operational control sufficient to constitute employers within the meaning of 29 U.S.C. § 203(d).

18. At all times material, TDI and GCC jointly exercised control over Plaintiff's employment. Plaintiff performed work for both entities, including overseeing GCC's marketing efforts and assisting with church events. Mr. Scott directed and supervised Plaintiff's work while exercising authority over both GCC and TDI. The individual elder Defendants provided leadership and oversight of TDI and GCC.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Longstanding Business Relationship with GCC

19. Beginning in approximately 2017, Plaintiff provided marketing, branding, social media, strategic consulting, and related services to GCC at the request of Mr. Scott, who had become GCC's lead pastor.

20. Plaintiff initially provided these services through his former marketing agency, PRODONOS, LLC, and subsequently used Revolver Marketing, LLC ("Revolver"), which he established in approximately 2020, to invoice for his consulting services.

21. Over the course of their business relationship, Mr. Scott regularly requested services from Plaintiff by telephone, email, and text message.

22. In response to these requests, Plaintiff, through his marketing agencies, performed the requested work and submitted invoices to GCC or its affiliated entities.

23. For several years, GCC and its affiliates accepted these services and paid the corresponding invoices in the ordinary course of business.

24. As GCC expanded its operations, Plaintiff's services also expanded to include marketing and consulting work for various GCC-affiliated ventures, including The Commons at Trinity, Trinity Commons Coffee, GSports, and other related projects.

25. In approximately 2023, Mr. Scott began discussing with Plaintiff the formation of TDI, a development entity intended to develop church-associated property into a sports, hospitality, entertainment, and commercial destination known as “Trinity.”

26. TDI was owned and controlled by GCC, shared leadership with GCC, and operated in close coordination with GCC's personnel and resources.

27. In connection with this development project, Mr. Scott continued requesting marketing, branding, consulting, planning, and related services from Plaintiff through Revolver.

**B. Defendants' Failure to Pay Outstanding Consulting Invoices**

28. Beginning in approximately 2023, GCC and its affiliated entities became increasingly irregular in their payments for Plaintiff's consulting services.

29. Invoices that had previously been paid in the ordinary course were instead paid late, combined into lump-sum payments, or left outstanding.

30. Despite the growing outstanding balance, Mr. Scott and other representatives of GCC continued requesting and accepting additional services from Plaintiff.

31. When Plaintiff raised concerns regarding the unpaid invoices, Mr. Scott repeatedly assured him that the Trinity development project was approaching full funding and that all outstanding amounts would be paid once financing became available.

32. In reliance upon the parties' longstanding business relationship and these assurances, Plaintiff continued providing the requested services through Revolver.

33. Between June and November 2024, Revolver issued twelve invoices totaling $83,512.91 for marketing, consulting, project work, meetings, travel, and related services and expenses provided by Plaintiff for the benefit of GCC and its affiliated entities.

34. Eleven of these invoices were issued to The Commons at Trinity, while one invoice, in the amount of $486.00, was issued directly to GCC.

35. The invoices identified the services or expenses charged, the amounts due, and the applicable payment deadlines.

36. The requested services were performed, and GCC and its affiliated ventures received and accepted the benefit of those services.

37. The consulting services performed by Plaintiff through Revolver benefited both GCC and TDI, including through marketing, branding, strategic consulting, planning, and development-related work associated with the Trinity development project.

38. Both GCC and TDI were aware of the services being performed, accepted the benefits of those services, and retained the value of Plaintiff's work without paying the outstanding invoices.

39. Neither Mr. Scott nor the representatives who requested or accepted the services contemporaneously disputed the quality of the work or the amounts invoiced.

40. Nevertheless, no payment has been made toward the outstanding $83,512.91.

41. Defendants' repeated promises to pay the outstanding invoices were among the representations upon which Plaintiff relied when deciding to transition from his existing consulting business to full-time employment with TDI.

**C. Defendants Recruit Plaintiff for Full-Time Employment**

42. In late 2023, Mr. Scott began discussing with Plaintiff the possibility of joining GCC's affiliated operations as a full-time executive.

43. The proposed position initially contemplated a Chief Marketing Officer role, but subsequently expanded to include broader operational and development responsibilities.

44. Mr. Scott and his wife met with Plaintiff and his wife and formally offered him a full-time position associated with the Trinity development project.

45. In connection with this offer, Mr. Scott represented that the development project was close to being fully funded and that substantial investment funds were expected to become available.

46. Mr. Scott instructed Plaintiff to wind down his existing business relationships, sell his home in Colorado, and relocate his family to the Trinity, Florida area.

47. Mr. Scott also connected Plaintiff with a Florida realtor to facilitate the anticipated relocation.

48. In reliance on the offer of employment and representations concerning the project, Plaintiff began disengaging from existing clients and business commitments, placed his Colorado home on the market, and began preparing his family for relocation.

**D. Plaintiff's Written Employment Agreement**

49. Effective September 1, 2024, Plaintiff entered into a written Employment Agreement with TDI to serve as a full-time executive.

50. Although Section 1 of the Employment Agreement refers to the position as Chief Financial Officer, the Agreement's introductory language identifies the position as Chief Operating Officer, and Plaintiff actually performed Chief Operating Officer duties.

51. Pursuant to Section 2(A), TDI agreed to compensate Plaintiff at an annual base salary of $220,000, payable in equal pro rata installments on the Company's regular payroll dates.

52. Pursuant to Section 2(D), TDI separately agreed to provide Plaintiff a $35,000 relocation/sign-on bonus, payable within thirty days of the Agreement's effective date.

53. The Employment Agreement did not condition payment of the relocation/sign-on bonus upon Plaintiff first completing his relocation to Florida.

54. Pursuant to Section 2(E), TDI further agreed to reimburse Plaintiff for reasonable and necessary business expenses within fifteen days after submission of the required expense report and supporting documentation.

55. Section 4(B) of the Employment Agreement provided that, in the event TDI terminated Plaintiff without Cause, and provided he executed a general release of claims acceptable to TDI, he would receive continuing base-salary payments for up to twelve months following termination, or until he entered into a qualifying compensated relationship of equal or greater value, whichever occurred earlier.

56. The Employment Agreement also expressly provided that Minnesota law would govern its validity, interpretation, performance, and enforcement.

**E. Plaintiff Performs His Employment Duties Without Receiving Compensation**

57. Plaintiff commenced full-time employment with TDI on September 1, 2024.

58. Because his Colorado home had not yet sold and TDI had not provided the promised relocation funds, Plaintiff initially performed his duties remotely from Colorado while regularly traveling to Florida for business meetings and project responsibilities.

59. As Chief Operating Officer, Plaintiff's responsibilities included, among other things:

a. Overseeing master planning and preconstruction activities associated with the Trinity development project;

b. Coordinating with architects, construction teams, vendors, and development partners;

c. Addressing municipal, state, and local permitting requirements and land assemblage matters;

d. Managing marketing, branding, and public relations activities;

e. Overseeing GCC's marketing team;

f. Meeting with prospective investors, financial institutions, and financing partners;

g. Participating in efforts to secure financing for the Trinity development project; and

h. Coordinating contracts, agreements, and project-related matters with other TDI personnel and counsel.

60. Although Plaintiff's Employment Agreement was executed with TDI, Plaintiff also performed substantial services directly benefiting GCC during his employment, including overseeing GCC's marketing team, assisting with church events, and performing marketing, branding, and operational work for GCC's benefit.

61. GCC knew of, accepted, and retained the benefits of Plaintiff's work, including services performed for GCC at the direction of Mr. Scott, who exercised authority over both entities.

62. During his employment, Plaintiff regularly worked approximately 50 to 60 hours per week, including substantial work beyond forty hours in individual workweeks.

63. Plaintiff performed these duties under the direction and supervision of Mr. Scott and other TDI leadership, including Chief Strategy Officer Orton Varona.

64. In October and November 2024, Plaintiff continued traveling to Florida, meeting with project partners and vendors, and assisting TDI with the development project.

65. By approximately November 2024, Plaintiff learned that the anticipated financing was not fully secured, contrary to the earlier representations made concerning the project's funding.

66. As a result, his responsibilities increasingly included identifying and pursuing alternative financing sources and prospective investors.

67. In December 2024, Plaintiff continued representing TDI in communications with financial institutions and prospective investors, while also managing public relations and media matters associated with the development project.

68. His work continued through January and February 2025, including further efforts to secure substantial project financing and meetings with investors, city officials, and construction teams.

69. Throughout his employment, from September 1, 2024, through March 3, 2025, Plaintiff performed his employment duties for TDI without receiving a single salary payment. TDI failed to pay Plaintiff any portion of the compensation required by his Employment Agreement.

70. At his contractual annual salary of $220,000, Plaintiff earned approximately $110,000 in base salary from September 1, 2024, through February 28, 2025, plus additional pro rata compensation through his termination on March 3, 2025.

71. TDI failed to pay any portion of that earned salary.

72. TDI also failed to pay the $35,000 relocation/sign-on bonus due within thirty days of the Employment Agreement's effective date.

73. Additionally, Plaintiff incurred expenses associated with business-related travel, lodging, transportation, and meetings undertaken for TDI's benefit, which were not reimbursed.

**F. Plaintiff's Termination Without Cause**

74. In January and February 2025, Plaintiff and his family proceeded with the sale of their Colorado home in preparation for the anticipated relocation to Florida.

75. On March 3, 2025, Plaintiff learned that the buyer's contingencies had been removed and a closing date had been established for the sale of his home.

76. Approximately one hour later, Mr. Scott informed Plaintiff by email that TDI was terminating his employment effective immediately.

77. The termination correspondence attributed the decision to organizational restructuring and did not identify any misconduct, performance

deficiency, or other conduct constituting Cause under Section 4(A) of the Employment Agreement.

78. At the time of his termination, Plaintiff had continued performing substantial work for TDI, including traveling to Florida and participating in meetings with project teams, investors, and government officials.

79. Despite terminating Plaintiff without invoking Cause, TDI did not pay him the severance compensation contemplated by Section 4(B) of the Employment Agreement.

80. TDI also failed to provide Plaintiff with the general release contemplated by Section 4(B) for execution in connection with severance.

81. In his March 3, 2025 termination correspondence, Mr. Scott expressly acknowledged the outstanding compensation obligations and stated that the Company would prioritize Plaintiff's Revolver invoices and TDI back payroll.

82. Nevertheless, neither Plaintiff's outstanding salary nor the Revolver invoices were paid.

**G. Plaintiff's Continued Efforts to Obtain Payment**

83. Following his termination, Plaintiff continued communicating with TDI and GCC representatives regarding the outstanding amounts owed.

84. Through March 2025, Mr. Scott and Mr. Varona continued representing that payments would be forthcoming.

85. Mr. Varona thereafter continued communicating with Plaintiff regarding the possibility of payment, but no payment was made.

86. On March 4, 2026, Plaintiff formally requested that GCC's governing elders resolve the outstanding obligations.

87. On April 8, 2026, Plaintiff again wrote to the elders requesting payment.

88. On April 13, 2026, Defendant Tom Kehoe, in his capacity as Chairman of GCC's governing elders, acknowledged receipt of Plaintiff's communications regarding the outstanding obligations and requested documentation establishing that the invoiced work had been authorized and completed.

89. On April 25, 2026, Plaintiff responded, explaining the parties' longstanding course of dealing, Mr. Scott's practice of authorizing work directly, and the absence of any prior dispute concerning the services provided or invoices submitted.

90. Despite these repeated efforts, the outstanding consulting invoices and Plaintiff's contractual employment compensation remain unpaid.

## COUNT I
## MINIMUM WAGE VIOLATIONS OF THE FAIR LABOR STANDARDS ACT
## (AGAINST ALL DEFENDANTS)

91. Plaintiff re-alleges paragraphs 1 through 90 as if fully stated herein.

92. At all times material, Plaintiff was an employee of Defendants within the meaning of 29 U.S.C. § 203(e)(1).

93. Defendants were Plaintiff's employers within the meaning of 29 U.S.C. § 203(d), including because they exercised operational control over his employment and suffered or permitted him to perform work for their benefit.

94. Plaintiff performed compensable work for Defendants from approximately September 1, 2024, through March 3, 2025.

95. Throughout this period, Defendants failed to pay Plaintiff any wages for the work he performed.

96. Accordingly, Plaintiff's total compensation in each relevant workweek was less than the federal minimum wage of $7.25 per hour required by 29 U.S.C. § 206(a).

97. Defendants knew Plaintiff was performing work and knew he had received no compensation for that work.

98. Defendants' failure to pay Plaintiff the required minimum wages was knowing and willful.

99. By reason of Defendants' intentional, willful, and unlawful conduct, Plaintiff has suffered damages in the amount of unpaid minimum wages.

100. Defendants did not have a good-faith basis for failing to pay Plaintiff the minimum wage, and Plaintiff is therefore entitled to liquidated damages pursuant to 29 U.S.C. § 216(b).

101. Plaintiff has retained undersigned counsel to represent him in this action and is entitled to recover reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

**COUNT II**
**OVERTIME VIOLATIONS OF THE FAIR LABOR STANDARDS ACT**
**(AGAINST ALL DEFENDANTS)**

102. Plaintiff re-alleges paragraphs 1 through 90 as if fully stated herein.

103. Plaintiff routinely worked approximately 50 to 60 hours per week during his employment, including hours exceeding forty in individual workweeks.

104. Defendants knew or should have known of the hours Plaintiff worked, including because they directed, supervised, participated in, and accepted the benefit of his work.

105. Although the Employment Agreement contemplated an annual salary of $220,000, Defendants failed to pay Plaintiff any salary during his employment.

106. Because Plaintiff received no salary payments, he was not paid on a salary basis as required for the executive and administrative exemptions under 29 C.F.R. Part 541.

107. Plaintiff was therefore entitled to overtime compensation at one and one-half times his applicable regular rate for hours worked in excess of forty per workweek pursuant to 29 U.S.C. § 207(a)(1).

108. Defendants knowingly and willfully failed to pay Plaintiff overtime compensation for any hours worked in excess of forty per workweek.

109. By reason of Defendants' intentional, willful, and unlawful conduct, Plaintiff suffered damages in the amount of unpaid overtime compensation.

110. Defendants did not have a good-faith basis for failing to pay overtime wages, and Plaintiff is therefore entitled to liquidated damages pursuant to 29 U.S.C. § 216(b).

111. Plaintiff has retained undersigned counsel to represent him in this action and is entitled to recover reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

## COUNT III
## BREACH OF CONTRACT
## UNPAID SALARY AND RELOCATION BONUS
## (AGAINST TRINITY DEVELOPMENT INITIATIVE, INC.)

112. Plaintiff re-alleges paragraphs 1 through 90 as if fully stated herein.

113. Plaintiff and TDI entered into a valid and enforceable written Employment Agreement effective September 1, 2024.

114. Pursuant to Section 2(A), TDI agreed to pay Plaintiff an annual base salary of $220,000 in equal pro rata installments on its regular payroll dates.

115. Pursuant to Section 2(D), TDI separately agreed to pay Plaintiff a $35,000 relocation/sign-on bonus within thirty days of the Agreement's effective date.

116. Plaintiff performed his obligations under the Employment Agreement by rendering full-time services from September 1, 2024, through March 3, 2025.

117. TDI materially breached Section 2(A) by failing to pay Plaintiff any portion of the salary he earned throughout his employment.

118. TDI separately materially breached Section 2(D) by failing to pay the $35,000 relocation/sign-on bonus within the contractual deadline.

119. As a direct and proximate result of these breaches, Plaintiff suffered damages consisting of unpaid earned salary, the $35,000 relocation/sign-on bonus, and recoverable interest.

**COUNT IV**
**BREACH OF CONTRACT**
**UNREIMBURSED BUSINESS EXPENSES**
**(AGAINST TRINITY DEVELOPMENT INITIATIVE, INC.)**

120. Plaintiff re-alleges paragraphs 1 through 90 as if fully stated herein.

121. Section 2(E) of the Employment Agreement obligated TDI to reimburse Plaintiff for reasonable and necessary business expenses within fifteen days after submission of an expense report and required supporting documentation.

122. During his employment, Plaintiff incurred reasonable and necessary business expenses in connection with travel, transportation, lodging, and meetings undertaken for TDI's benefit.

123. Plaintiff sought reimbursement for business-related expenses incurred in performing his employment duties.

124. TDI failed to reimburse Plaintiff for qualifying expenses in accordance with the Employment Agreement.

125. As a direct and proximate result of TDI's breach, Plaintiff suffered damages in the amount of his unreimbursed qualifying business expenses, excluding expenses separately invoiced through Revolver.

## COUNT V
## BREACH OF CONTRACT
## UNPAID SEVERANCE
## (AGAINST TRINITY DEVELOPMENT INITIATIVE, INC.)

126. Plaintiff re-alleges paragraphs 1 through 90 as if fully stated herein.

127. Section 4(B) of the Employment Agreement provided that, upon termination without Cause and execution of a general release acceptable to TDI, Plaintiff would be entitled to continuing payments of his base salary for up to twelve months following termination, subject to the provision concerning subsequent compensated employment, consulting, or other business relationships.

128. On March 3, 2025, TDI terminated Plaintiff's employment without invoking any of the grounds constituting Cause under Section 4(A).

129. TDI failed to provide Plaintiff with the general release contemplated by Section 4(B) for execution in connection with severance.

130. TDI's failure to provide the contemplated release prevented Plaintiff from completing the contractual release process necessary to receive severance compensation.

131. TDI materially breached Section 4(B) by failing to pay the severance compensation owed following Plaintiff's termination without Cause, to the extent the release condition was satisfied or legally excused.

132. As a direct and proximate result of TDI's breach, Plaintiff suffered damages in the amount of severance compensation due under the Agreement, subject to its express limitations.

**COUNT VI**
**BREACH OF CONTRACT**
**UNPAID CONSULTING INVOICES**
**(AGAINST GENERATIONS CHRISTIAN CHURCH AT TRINITY, INC.)**

133. Plaintiff re-alleges paragraphs 1 through 90 as if fully stated herein.

134. Beginning in approximately 2017, GCC, through its authorized representatives, including Mr. Scott, engaged Plaintiff to provide marketing, branding, consulting, and related services for GCC and its affiliated operations.

135. Pursuant to the parties' longstanding course of dealing, GCC's representatives regularly requested services from Plaintiff, Plaintiff performed the requested services through his marketing businesses, and invoices were submitted for payment.

136. GCC and its affiliated entities regularly paid invoices for several years, confirming the parties' agreement that the requested services would be compensated.

137. Beginning in approximately 2023, GCC's payments became increasingly irregular, and invoices for services requested and performed by Plaintiff remained outstanding.

138. Despite the outstanding balance, GCC continued requesting and accepting additional services from Plaintiff, and Mr. Scott repeatedly assured Plaintiff that payment would be forthcoming.

139. Between June and November 2024, twelve invoices totaling $83,512.91 were issued through Revolver for services performed and expenses incurred in connection with GCC and its affiliated operations.

140. Plaintiff performed the requested services, and GCC and its affiliated operations accepted the benefit of those services.

141. GCC failed to pay the outstanding invoices despite repeated demands for payment and assurances from Mr. Scott that the obligations would be satisfied.

142. GCC's failure to pay the amounts owed constitutes a material breach of the parties' agreement for consulting and related services.

143. As a direct and proximate result of GCC's breach, Plaintiff has suffered damages in the amount of $83,512.91, plus recoverable interest.

## COUNT VII
## UNJUST ENRICHMENT
## (AGAINST TRINITY DEVELOPMENT INITIATIVE, INC. AND GENERATIONS CHRISTIAN CHURCH AT TRINITY, INC., IN THE ALTERNATIVE)

144. Plaintiff re-alleges paragraphs 1 through 90 as if fully stated herein and pleads this Count in the alternative to Count VI.

145. Plaintiff conferred valuable benefits upon GCC and TDI by providing marketing, branding, consulting, development-related, and other services requested by GCC, TDI, and their authorized representatives.

146. GCC and TDI had knowledge of the benefits conferred because the services were requested, directed, and accepted by their representatives.

147. GCC and TDI voluntarily accepted and retained the benefits of Plaintiff's services.

148. Plaintiff provided these services with the reasonable expectation of compensation, consistent with the parties' longstanding business relationship.

149. GCC and TDI have failed to pay for the services provided and benefits received, despite repeated requests for payment.

150. Under the circumstances, it would be inequitable for GCC and TDI to retain the benefits of Plaintiff's services without paying their reasonable value.

151. To the extent no enforceable express contract governs the services at issue, Plaintiff is entitled to restitution for the reasonable value of the uncompensated benefits conferred upon and retained by GCC and TDI.

## COUNT VIII
## UNJUST ENRICHMENT
## (AGAINST GENERATIONS CHRISTIAN CHURCH AT TRINITY, INC.)

152. Plaintiff re-alleges paragraphs 1 through 90 as if fully stated herein.

153. Effective September 1, 2024, Plaintiff entered into a written Employment Agreement with TDI to serve as a full-time executive in exchange for an annual base salary of $220,000 and other compensation.

154. Although GCC owned and controlled TDI, GCC was not a party to Plaintiff's Employment Agreement.

155. During his employment, Plaintiff performed substantial services directly benefiting GCC, including overseeing GCC's marketing team, assisting with church events, and performing marketing, branding, and operational work for GCC's benefit.

156. GCC had knowledge of the benefits conferred because Plaintiff performed these services under the direction and supervision of Mr. Scott, who exercised authority over both GCC and TDI.

157. GCC voluntarily accepted and retained the benefits of Plaintiff's services.

158. Plaintiff performed these services with the reasonable expectation of compensation. Nevertheless, Plaintiff received no compensation for the services he performed during his employment.

159. GCC therefore received and retained the benefits of Plaintiff's uncompensated services without paying their reasonable value.

160. Under the circumstances, it would be inequitable for GCC to retain those benefits without providing compensation.

161. Accordingly, Plaintiff is entitled to restitution from GCC for the reasonable value of the uncompensated benefits conferred upon and retained by GCC, without duplicative recovery under Plaintiff's other claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Enter judgment in favor of Plaintiff and against Defendants, jointly and severally as applicable, for unpaid minimum wages and overtime compensation;

b. Award Plaintiff an equal amount of unpaid minimum wages and overtime compensation as liquidated damages pursuant to 29 U.S.C. § 216(b);

c. Enter judgment in favor of Plaintiff and against Defendant TDI for unpaid contractual salary, the $35,000 relocation/sign-on bonus,

qualifying unreimbursed business expenses, and severance compensation to the extent recoverable under the Employment Agreement;

d. Enter judgment in favor of Plaintiff and against Defendant GCC for $83,512.91 in unpaid consulting invoices, or alternatively, against Defendants GCC and TDI for restitution in the reasonable value of uncompensated consulting services and benefits conferred;

e. Enter judgment in favor of Plaintiff and against Defendant GCC for restitution in the reasonable value of uncompensated employment-related services and benefits conferred upon GCC;

f. Award prejudgment and postjudgment interest as permitted by applicable law;

g. Award reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b), and any additional fees or costs independently authorized by applicable law or contract; and

h. Grant such other and further relief as the Court deems just and proper, without permitting duplicative recovery.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 19, 2026

Respectfully submitted,
*/s/ Patricia A. Fors*_____

**EXHIBIT G LAW FIRM, PLLC**
Giselle Gutierrez, Esq.
Florida Bar No.: 100254
Giselle@ExG-Law.com
Patricia A. Fors, Esq.
Florida Bar No.: 1058218
Patricia@ExG-Law.com
Rebeca Rodriguez, Esq.
Florida Bar No.: 1079525
Rebeca@ExG-Law.com
2030 S. Douglas Rd., #203
Coral Gables, Florida 33134
(305) 340-7066
***Counsel for Plaintiff***